[No. 25697.  Department One.  August 8, 1935.]

RICHARD W. BARBER *et al., Respondents,* v. THE CITY OF
SEATTLE, *Appellant.*[1]

[1]Reported in 48 P. (2d) 234.

*A. C. Van Soelen, C. C. McCullough,* and *John A. Logan,* for appellant.

*Kahin & Carmody* and *Orlo B. Kellogg,* for respondents.

TOLMAN, J.—This is an action brought by the parents to recover for the wrongful death of a minor son. The case was tried to a jury, which returned a verdict against the defendant city, and from a judgment on the verdict, the city has appealed.

While there are seven formal assignments of error, all have been argued together, and from the manner of presentation we gather that the appellant, as its principal ground for reversal, takes the position that there was not sufficient evidence of its negligence to take the case to the jury, and that its motion for judgment n. o. v. should, therefore, have been granted. In addition, the appellant assigns error upon the refusal to strike a portion of the complaint, upon the admission of certain evidence, and upon one of the instructions given to the jury.

The first question calls for a brief but fairly comprehensive statement of the facts as the jury was warranted in finding them to be.

The minor, who was then eight years of age, was, on the morning of November 29, 1931, engaged in assisting an older boy in delivering newspapers. They were using an automobile driven by the older boy, a youth of sixteen years. The car, with both boys as occupants, was driven upon a drawbridge owned, operated and maintained by the city, on a foggy morning, crashed through a light barrier, and dropped into the river through an open draw, carrying the boys to their death.

The car approached the bridge on an upgrade of five per cent upon a curving roadway surfaced to a

width of twenty-five feet and three inches with asphalt on one side and planking upon the other. The approach begins at a point 375 feet from the draw. At a point approximately three hundred feet from the draw, was placed a warning sign painted yellow. Seventy-one feet from the draw was a wig-wag signal of the regular railroad type with a red light and a gong. When in operation, this signal swung back and forth, displaying the light in motion and causing the gong to strike continuously. Forty-seven feet from the draw was a gate of a type in common use, which, when the bridge was closed and the draw open, was intended to be lowered so that the arms of 1"x6" wooden strips would extend across the roadway. The gate carried two red lights, which were placed and designed so as to shine in the roadway ahead of the approaching traveler when the gate was lowered.

The bridge operator's quarters were on the side opposite to that from which the boys approached, and the operating machinery by which the warnings were set and the bridge opened and closed was in the center of the bridge, a considerable distance from the signals which we have described.

The testimony was such as to warrant the jury in finding that the wig-wag signal was not operating when the boys approached. Presumably, the gate was in position, but whether its red lights were burning is not shown. In any event, there was evidence from which the jury could have found that, because of the dense fog, the lights, even if burning, could not be seen until one was practically upon them. It further appears that the roadway was icy and slippery and had not been sanded on that morning, according to the usual custom generally followed by the city in icy weather.

No one actually saw the car which carried these boys

when it dropped into the river, but there was one witness, who was very nearly an eye witness, whose evidence is enlightening and must have been rather convincing to the jury. This witness, driving a truck, followed behind the boys, as they drove toward the bridge, at a distance of perhaps one hundred and fifty feet. He testified that the fog was exceedingly heavy, but that it lay in banks or streaks, and only at intervals could he see the car ahead of him carrying the boys, but that he was driving between fifteen and twenty miles per hour and that the boys maintained their distance and were apparently driving at about the same rate of speed. Apparently, the fog was such that this witness did not see the car carrying the boys after it entered upon the bridge proper, and perhaps not much after it passed the first warning sign.

This witness testified that, when he got to the bridge, he heard no bell, saw no light, and discovered no indication that the draw was open. Relying upon the lack of warning by wig-wag and lights, he therefore proceeded upon the assumption that the bridge was open to traffic until he came within a few feet of the broken arm of the gate lying upon the roadway ahead of him. Actuated by that warning, he set his brakes; his truck skidded, but fortunately he stopped in time, and then, walking ahead, he found the draw open. A number of other witnesses testified to the absence of any ringing bell such as customarily rang when the draw was open.

Testimony of this character is sufficient to take the case to the jury, under well settled authority. Even though the city might have been under no duty to install a wig-wag system, yet, having installed it and taught the public to rely upon it, the failure to operate it in a particular instance would create a trap and constitute negligence. *Ray v. Hines,* 118 Wash. 530, 203 Pac. 929; *Patterson v. Oregon-Washington R. & N.*

*Co.,* 118 Wash. 536, 203 Pac. 931; *Aores v. Great Northern R. Co.,* 166 Wash. 17, 6 P. (2d) 398. The subject is considered at length and the authorities reviewed in a note found in 71 A. L. R. 1175. Whether the wigwag system failed to operate because of defects or because the bridge tender failed to put it in motion, is immaterial. Either would tend to show negligence.

Taking the whole situation and giving due weight to each element, including the known tendency to heavy fogs, especially on frosty mornings and along the water courses in that vicinity, the slippery condition of the roadway when affected by fog and ice, the failure of the wig-wag to perform, and that there was no barrier, but only a light warning gate which would not stop or seriously impede an automobile going at a lawful rate of speed, it would seem that there was ample evidence to take the case to the jury.

The court instructed the jury in these words:

"The general charge of negligence or carelessness made by the plaintiffs against the defendant includes alleged negligence in the selection of the appliances and devices adopted and installed as a part of its system at the bridge in question and negligence in the maintenance and operation of its system as installed. With reference to the city's duty in the matter of its appliances, devices, etc., the law requires that the city shall, in selecting and installing its appliances and devices, use that degree of care which reasonably prudent men so engaged would use under similar circumstances, to have and to procure and install such as the experience of men so engaged may show to be reasonably safe for the purposes for which they are used, in view of all the conditions and circumstances connected with the situation and of the dangers to be reasonably apprehended."

Appellant seems to construe this instruction as placing an imperative duty upon the city to maintain a barrier of sufficient strength to stop automobiles,

thus violating the general rule requiring highways to be kept only in a reasonably safe condition. We do not so read the instruction. At the most, it permits the jury to find that, under the known conditions and in the light of prior experience, as shown by the testimony, the city failed to install a reasonably safe warning and protective system.

Since there was ample evidence to take the case to the jury on the question of negligent operation of the system as installed, and since one who reads the evidence can hardly doubt that the verdict was rested upon negligent operation, this instruction might very well have been omitted, but, nevertheless, in view of the testimony as to modern systems now in use and the rather convincing showing that the warning gate had been repeatedly broken by vehicles prior to this accident, we think the question of the sufficiency of the warning system was in the case, and that this instruction properly submitted it to the jury under the authorities which follow.

In 4 R. C. L. 217, it is said:

"If guard rails are reasonably necessary for the safety of travelers and their property in crossing a bridge, then the owners are liable for an injury which is caused by a failure to construct them. The guard rails, furthermore, should be effective for the purpose for which they are constructed. They should be reasonably strong and maintained so as to withstand the ordinary weights and forces to which they are subjected, and the safeguards should be suited to the character of its ordinary traffic."

See, also, *Einseidler v. Whitman County,* 22 Wash. 388, 60 Pac. 1122, and *Zolawenski v. Aberdeen,* 72 Wash. 95, 129 Pac. 1090.

The city relies very strongly upon the case of *Gerrie v. Port Huron,* 226 Mich. 630, 198 N. W. 236. While in numerous respects the facts in that case are

remarkably similar to those which we are now considering, yet in one respect at least it is distinguishable. There is no evidence in that case of the failure of the warning signal to work. In addition to that, there are a number of other distinctions, such as the absence of fog and a straight and apparently level approach, well lighted, which afforded the approaching traveler full visibility. Everything provided in the way of warning was in full operation, just as the traveler had a right to expect; and the case presents no facts tending to show conditions which would deceive or entrap the traveler.

The court there upheld a directed verdict upon the general principle that the municipality was not bound to maintain a barrier which would absolutely stop an automobile, basing its decision upon Babbitt, Law of Motor Vehicles (3d ed.), § 414. With that rule we are in hearty accord, but yet, under the peculiar facts of this case, we think the question of whether the warning system taken as a whole was reasonably sufficient was properly submitted to the jury.

Under our well recognized rule that a complaint will be considered amended to conform to the proof, it would seem that, after verdict, the question of striking, or refusing to strike, from the complaint, is not ordinarily of vital importance. The ruling in this respect of which complaint is made does not appear to have influenced the course of the trial or to have affected the verdict, and therefore the question will not now be considered.

The remaining question relates to the introduction of evidence. The respondents upon the trial below contended vigorously, and offered much evidence to show, that the construction and condition of the bridge, including its warning devices, in the light of all of the surrounding circumstances, was not rea-

sonably safe for public travel; and it sought to bring home to the city notice of that condition and a neglect to remedy it.

In order to show such notice, respondents offered in evidence a letter from the city engineer written to the city council some six months previous to the accident, in which he said:

"Honorable City Council,                    April 6, 1931
Seattle, Washington.
Gentlemen:

"In examining for maintenance our drawbridge over 1st Avenue South—also drawbridge over 8th Avenue South— I am impressed with the very dangerous condition that exists there because of the weakness of the protecting gates, and the great danger of automobiles under poor control and during times of poor lighting passing through these gates and dropping into the sound, thus drowning their occupants.

"This matter so impresses me with its dangers that I am asking permission to spend $8,000 of this year's budget, as appropriated under Ordinance No. 60276, for the construction and installation of a Yielding Traffic Barrier.

"We have Yielding Traffic Barriers for the protection of traffic across the Montlake Bridge, photographs of which I submit herewith, and to show the open condition of 1st Avenue South Bridge I enclose photograph of that station with the bridge partly open.

"The danger to life and limb at the 8th Avenue South Bridge is fully equal to that at the 1st Avenue South Bridge, and were there sufficient funds in the budget I would ask an appropriation to cover both.

"Careful study of the demands up to date shows that by great caution we can take from Ordinance No. 60276 sufficient money to build one barrier, but we cannot take from that ordinance more than that amount, though probably if we should contract for two barriers at the same time the combined cost would be slightly less than if contracted for at separate intervals."

The trial court ruled that parts of the letter were admissible as showing notice to the city and indicated

that certain parts would be admitted. Thereupon, counsel for the city said:

"If your Honor please, since you are admitting this portion of it, and in view of the ruling on certain evidence, I move at this time that the letter in its entirety be read to this jury; however, reserving my objection to this portion unless that is done."

Whereupon, the court admitted the letter.

There can be no doubt that the letter or portions of it were admissible for the purpose of showing notice to the city. That the jury was not told to consider the letter for no other purpose, is probably due to the failure of the city to request such a ruling. At any rate, since the court instructed the jury that the city was not an insurer of safety of its bridges and was required to use only reasonable and ordinary care to keep them safe for travel, and that barriers need not be constructed of such material as would absolutely withstand the momentum of an automobile, it can hardly be contended that the court did not protect the city so far as it reasonably might from the misuse by the jury of the letter in question.

Finding no reversible error, the judgment is affirmed.

MAIN, STEINERT, and GERAGHTY, JJ., concur.

BEALS, J. (dissenting)—In my opinion, the trial court erred in giving the instruction quoted, and because of this error the judgment appealed from should be reversed and a new trial ordered. I accordingly dissent.