[No. 28824. *En Banc.* May 17, 1943.]

BESSIE M. COX, *as Administratrix, Respondent,* v. POL-SON LOGGING COMPANY, *Appellant.*[1]

[1]Reported in 138 P. (2d) 169.

*L. B. Donley,* for appellant.

*Hogan & Adams* and *Gladys Phillips,* for respondent.

STEINERT, J.—In this action recovery is sought for the alleged wrongful death of plaintiff's deceased husband, Otto Cox, who was killed when an automobile in which he was riding as a guest ran into the side of a logging train owned by the defendant, Polson Logging Company, and operated by its employees. The cause was tried to a jury, which returned a verdict for the plaintiff, administratrix of the decedent's estate, in the sum of $19,411. Defendant's motion for judgment notwithstanding the verdict was denied and, after argument upon defendant's alternative motion for new trial, the court ruled that unless the plaintiff should consent to a

reduction in the amount of the verdict to an amount then specified by the court the motion for new trial would be granted. Plaintiff consented to the reduction, and the court thereupon denied defendant's alternative motion. The court thereafter entered judgment for the plaintiff in the sum of $15,251, from which the defendant appealed.

A portion of U. S. highway 101, state highway number 9, known as the Olympic highway, connects the city of Hoquiam, Washington, with the town of Quinault, Washington. At a point approximately two and a half miles south of the intervening town of Neilton, the highway is intersected by a railroad grade crossing maintained by the appellant, Polson Logging Company, and known as crossing number five.

At this crossing, the highway extends in a northerly-southerly direction. The railroad track, extending in a northwesterly-southeasterly course, intersects the highway diagonally on a slight curve and, proceeding northerly from the intersection, runs more nearly in a westerly direction. For a distance of several hundred feet on each side of the railroad track the highway is straight and level, making no appreciable dip or rise on either side of the crossing. The highway in that area has a twenty-foot oiled surface, with a seven-foot shoulder on each side.

The surrounding country is heavily timbered, which has been cleared for the roadway to an approximate width of one hundred feet, or a distance of thirty-three feet beyond the edges of the shoulders. In the immediate vicinity of the crossing, north of the intersection and west of the highway, there is an area cleared of brush and some of the trees, so that one driving along the highway in a southerly direction would ordinarily have a view of several hundred feet of the railroad to the right, or west, of the highway. Beyond the north and south ends of the straight stretch of road which intersects the crossing, the highway curves in one direction or another, continuing through wooded areas.

At a point between four hundred and five hundred feet northerly from the crossing, beyond which the highway curves slightly to the west, there was a standard highway railroad crossing sign of the reflector type, consisting of a metal disc thirty inches in diameter, with two cross lines and the letters R.R. upon it. This sign was located on the outer edge of the westerly shoulder of the highway, seven feet from the outer edge of the oiled portion of the road and seventeen feet from the center stripe. At a point thirty-four feet north of the center of the railroad track at the intersection, and twenty-four feet west of the center line of the highway, there was also a standard black and white striped crossarm, or "cross-buck," sign bearing the words "RAILROAD CROSSING." This sign was likewise of the reflector type. When the headlights of approaching automobiles flashed upon the faces of the signs, the lettering upon them became luminous.

For a period of about two years immediately prior to the time of the accident, appellant's train crew had followed the custom, or practice, of throwing out a lighted flare upon the highway while the locomotive was in the act of crossing the road. The purpose of this was to warn travelers of the presence of the train upon the crossing. This precaution was not required of the appellant by any statute or departmental regulation, but was voluntarily assumed and exercised by the train crew regularly, except in those seasons and under weather conditions when there was a fire hazard in the wooded area. These flares consisted of handfuls of engine waste soaked in oil. The deceased, Otto Cox, and James A. Jensen, the owner and operator of the automobile in which the deceased was a passenger, were aware of this custom, for they had driven over the road at night on several occasions previously and had seen burning oil-soaked engine waste at the crossing.

On January 24, 1941, Jensen and Cox were engaged in falling timber near Sappho, Washington, which is lo-

cated about eighty miles northerly from crossing number five. At the end of the day's work, they decided to drive to their respective homes in Hoquiam and Centralia for the weekend. Jensen owned a 1935 automobile, which was in good mechanical condition, with excellent brakes and two windshield swipes in operation. They left Sappho about five p. m., with Jensen driving and Cox seated next to him in the front seat, and thus they proceeded down the Olympic highway. They arrived in the vicinity of crossing number five at about eight o'clock that evening.

It was an unusually stormy night. A strong wind was blowing and the rain was falling heavily, obscuring sound and rendering visibility poor. The automobile in which the two men were riding approached the crossing from the north at a speed of about thirty-five miles an hour. Appellant's train, consisting of a Baldwin locomotive, twenty-eight cars loaded with logs, and a caboose, approached the crossing from the west on a slight down grade, at a speed of about twelve miles an hour. Twenty-four of the twenty-eight loaded cars were of the "skeleton" type, and the other four were disconnected trucks. The entire train was about thirteen hundred feet in length. The loads of logs reached to within forty to forty-eight inches of the ground and extended upward as high as sixteen feet.

The automobile collided with the twenty-second car back of the locomotive, and as a result the machine was wrecked, Cox was killed, and Jensen was severely injured.

The only witnesses who testified directly concerning the collision were James A. Jensen, the driver of the automobile, and Thomas G. Shortreed, appellant's rear brakeman, who, at the time of the accident, was riding in the caboose. Jensen's testimony upon the subject was in substance as follows:

He had a general knowledge of the railroad crossing and its location, but was not aware that he was in the

immediate vicinity thereof until a moment before the collision. As he proceeded along the highway on the night in question, he did not see either of the railroad crossing signs. His explanation for this was, first, that the signs were so situated that his headlights did not strike upon nor illuminate them, and, second, that the heavy rain by its reflections produced a glistening effect upon the roadway, seriously interfering with the vision of one driving or occupying an automobile. He heard no sound of whistle or bell at any time. Having knowledge of the custom followed by the train crew, of throwing out lighted flares upon the highway as the locomotive passed over the crossing, he relied fully upon such a warning being given in the event the train should come by at that time of the evening. Seeing no flare ahead of him, he proceeded forward at a sustained speed of about thirty-five miles an hour. We quote a portion of his testimony:

"We were driving along, trying to watch the road when we got within—I would imagine about thirty-five feet and that train suddenly loomed up in front of us in the darkness, and I tried to stop. That's what I was doing, or trying to do. We were right up against the train before we saw it; then it was right in front of us, I would say approximately thirty-five feet, we were right close to it, and naturally I tried to stop. We were too close to stop. There were no signals there in the way of a light that night. *No flares of any kind.*" (Italics ours.)

His explanation of his failure to see the train sooner than he did is contained in the following testimony given by him on his direct examination.

"A. A night like that a logging train is very hard to see, especially if it is in the timber. Q. Why? A. Because of the color, it is black, dark, and blends right into the black road and timber also and the reflection of the glistening water, everything, makes everything in front of you look about the same. You would have to look very close if there had been any light at all I couldn't have done that."

On cross-examination he further described the crossing as being an unusually dangerous one under certain conditions of weather:

"Q. Why do you call it dangerous? A. Because it is in the timber, and because the reflections at night on that dark timber and dark color of the train, is hard to see and when it blends together it all looks alike. That is why I didn't see that train until it loomed up in front of the car. . . . Q. What is the element in that that makes you think it was an unusually dangerous crossing? . . . A. The reason it is a dangerous crossing on a stormy night or any rainy night is because when it is raining the surface of the road is black and your lights have less effect, it blends in with your timber and the log train, no lights on the wheels, no sidelights to show you that there is timber there, like they have on a transport truck or other lighted vehicle, and the quietness of a logging train, sliding through there like a snake. The first time the lights come up you are too close to stop, on a stormy night. On a clear night it is an entirely different picture, you can see every one of the road signs."

Several other persons, who arrived at the scene of the accident shortly after the collision, testified that they saw no flares and that none was burning at that time. None of these witnesses testified concerning the sound, or absence of sound, of a whistle or bell.

Shortreed, the rear brakeman, testified that he was riding in the caboose at the time of the collision and that, as the rear portion of the train neared the crossing, he observed the approaching automobile about a thousand feet away; that the caboose was equipped with standard switch lights which were burning and could be seen for a distance of half a mile; that, in order to attract the attention of the driver of the automobile, he swung his lantern from the rear of the caboose; that when the automobile did not decrease its speed he became apprehensive that the driver had not seen the train, whereupon he threw into the air a can containing lighted waste, hoping thus to attract the

automobilist's attention; that the automobile nevertheless proceeded onward and crashed into one of the loaded freight cars ahead of the caboose; that, as the caboose passed over the crossing, he observed upon the highway a burning flare which had been thrown earlier from the locomotive; that as quickly as possible he jumped from the train and ran back to the scene of the accident; and that on his arrival there the lighted flare cast from the locomotive was still burning.

The other members of the train crew all testified positively that a lighted flare was "kicked" from the locomotive as it passed over the crossing, and several disinterested witnesses testified that they saw a burning flare or light in the road at the intersection immediately or shortly after the collision. Various members of the train crew and a number of disinterested witnesses also testified emphatically that the whistle was blown and the bell rung repeatedly as the train approached, and as the locomotive passed over, the crossing.

The question as to whether or not a lighted flare was thrown or projected upon the highway by a member of the train crew was, obviously, a question of fact for the jury. The question as to whether or not there was sufficient evidence to make an issue of fact with regard to the giving or the failure to give the required statutory warning by blowing the whistle and ringing the bell, we shall consider later.

Appellant's brief begins with a statement of twenty-one questions said to be involved in the appeal and lists twenty-seven assignments of error alleged to have been committed by the trial court. The sum total of all these, however, may be resolved into three general groups of questions: (1) Whether the evidence was sufficient to take the case to the jury on the issue of appellant's negligence; (2) whether the decedent was guilty of contributory negligence as a matter of law; and (3) whether the trial court committed prejudicial

error in making certain rulings, giving certain instructions, and refusing to give certain other instructions requested by appellant.

■ Upon the first general question, appellant contends that there is no basis whatever for holding it guilty of negligence, regardless of whether or not it gave the statutory warning signals by whistle and bell. This contention is predicated upon the general rule obtaining in this state that when a train actually occupies a crossing, that in itself supersedes all other warnings and gives actual notice by its own presence. *Ullrich v. Columbia & Cowlitz R. Co.*, 189 Wash. 668, 66 P. (2d) 853; *Reines v. Chicago, Milwaukee, St. P. & Pac. R. Co.*, 195 Wash. 146, 80 P. (2d) 406; *Webb v. Oregon-Washington R. & N. Co.*, 195 Wash. 155, 80 P. (2d) 409; *Schofield v. Northern Pac. R. Co.*, 4 Wn. (2d) 512, 104 P. (2d) 324; *Hendrickson v. Union Pac. R. Co.*, 17 Wn. (2d) 548, 136 P. (2d) 438.

In each of those cases the accident occurred on a dark, cold night; in the *Ullrich* case the testimony showed that a fairly heavy rain was falling, with some wind; and in the *Reines* case it appeared that there was a dense fog. Nevertheless, in the last cited case it was specifically declared that the general rule above stated is applicable in cases where the railroad crossing is more or less obscured by fog or other weather conditions.

To this general rule, as above expressed, there is a well-recognized exception in this state, as well as elsewhere. The exception arises in cases where the combination of circumstances presents an unusual or extrahazardous situation or constitutes a device or spectacle in the nature of a trap or one that would naturally deceive a traveler on the highway. *Ullrich v. Columbia & Cowlitz R. Co., supra; Schofield v. Northern Pac. R. Co., supra; Licha v. Northern Pac. R. Co.*, 201 Minn. 427, 276 N. W. 813; *Christensen v. Willamette Valley R. Co.*, 139 Ore. 666, 11 P. (2d) 1060;

*Illinois Central R. Co. v. Maxwell,* 167 S. W. (2d) (Ky.) 841; *Hendrickson v. Union Pac. R. Co., supra.*

In the *Schofield* case, which was an *En Banc* decision, this court pointed out the exception as above noted, and, further, said:

"Whether when an automobile runs into the side of a train moving over a crossing or standing thereon presents a question of fact or one of law, depends upon the particular facts of each case."

The opinion in that case also rejected the proposition that, where an automobile crashes into the side of a railroad train on a crossing, the railway company would not under *any set of circumstances* be liable; thus recognizing that under certain conditions the railway company might be held guilty of negligence.

■ Having in mind the general rule and the exception thereto, we look to the circumstances as shown by the evidence which the jury was entitled to consider in this case. As pointed out above, the road in the immediate vicinity of the crossing, though straight and level, extended through a heavily wooded area. The railroad track, intersecting the highway, extended through a similar area. The train was approximately thirteen hundred feet in length and, except for the locomotive and caboose, was composed of twenty-eight unlighted freight cars carrying loads extending sixteen feet upward and reaching to within forty-eight inches of the rails. On a dark night the loaded cars blended into the black roadway and surrounding scenery, and would not be readily discernible. On a rainy, stormy night it would be even more difficult for an automobile driver to distinguish the train at a distance, because of the glistening effect of his headlights upon the falling rain. On such a night, also, the occupants of an automobile would not be as readily able as on a clear, quiet night to hear the sound of a passing train, particularly if such train were moving downgrade at a speed of only ten or twelve miles an hour.

It may be that, under this combination of circumstances alone, the general rule as expounded in the *Reines* and *Webb* cases, *supra,* would still apply and, as a matter of law, would absolve appellant from negligence, regardless of whether or not it gave the required warning signal by whistle and bell. But there is another factor, of singular importance, to be taken into consideration in the determination of this particular issue: Appellant had adopted a custom, or practice, of throwing a lighted flare out upon the highway as the locomotive passed over the crossing, during such seasons as that involved here. The purpose of this practice was to warn travelers on the highway of the presence of the train. The practice, though not compulsory upon appellant, had nevertheless been followed regularly for two years, and the traveling public had become accustomed to it. Jensen, the driver of the automobile, and Cox both knew of this practice and on the occasion in question relied fully upon it. According to the evidence which the jury was entitled to accept as true, no flare or light of any kind was thrown upon the highway by appellant's employees on this particular trip.

In *Ray v. Hines,* 118 Wash. 530, 203 Pac. 929, it appears that an automobile was struck by a freight train at a street crossing where it had been customary for a switchman to give warning to travelers of the approach of a train, by swinging a lighted lantern at the crossing. There was evidence in the case from which the jury could find that no such warning signal was given on the particular occasion. Judgment for the injured plaintiff was affirmed on appeal. Announcing the rule with reference to failure to give a customary warning, this court quoted from 33 Cyc. 946:

" 'Where a flagman is employed or a gate established, whether such duty is imposed by statute or not, the person in charge is bound to perform his duties with reasonable care and prudence, and a failure to do so is negligence for which the railroad company is liable.

Where a flagman or watchman is employed at a public highway crossing, until the public has become accustomed to regard his presence or absence as one of the evidences of the approach of trains, or otherwise, it is part of the company's duty to keep a fit person there whose conduct will not be liable to mislead and deceive the traveling public; and it is the duty of the flagman or watchman to use reasonable care to know and give timely warning of the near approach of trains, not only so as to avoid a collision, but also to enable a traveler approaching a crossing, in the exercise of reasonable care, to protect himself against other accidents, and the public have a right to rely upon a reasonable performance of that duty.'"

Following the quotation, occurs the statement by this court:

"Whether the flagman be stationed at the crossing, or the custom be established of giving a warning by the men in charge of the movement of trains across the street, the result is the same. In either case the public is led to expect the warning if there be imminent danger, and the failure to give the customary warning tends to mislead and deceive. In fact, such failure becomes in effect a trap."

In *Barber v. Seattle,* 182 Wash. 672, 48 P. (2d) 234, in which the failure to operate a wigwag system was involved, we said:

"Testimony of this character is sufficient to take the case to the jury, under well settled authority. Even though the city might have been under no duty to install a wig-wag system, yet, having installed it and taught the public to rely upon it, the failure to operate it in a particular instance would create a trap and constitute negligence."

In the recent case of *Illinois Central R. Co. v. Maxwell,* 167 S. W. (2d) (Ky.) 841, it appears that the plaintiff drove his automobile into a coal car standing across a highway and suffered personal injuries. His suit against the railroad company was submitted to the jury on the issue of whether it had been customary for

the company to have a flagman or lighted flares at the crossing to give warning of the presence of trains or cars standing across the road at night and on this occasion had not followed that custom. Discussing the rule of "customary practice and the right to rely upon it," the court of appeals of Kentucky said:

"Where it had been customary to do that [give reasonable and timely signals] and the traveler relied upon receiving such warning, the failure to give it is negligence. [Citing cases.] It is also the same principle as that applied where the railroad customarily maintained a watchman or gate at a dangerous public crossing and in a particular instance the flagman was absent or the gate open. The absence of the watchman or the open gate is an assurance of safety and the equivalent of an invitation to a traveler to proceed. [Citing cases.]"

In 52 C. J. 201, Railroads, § 1791, it is said:

"If signals are provided, although not required by statute, the public has the right to rely thereon, and the company must use reasonable care to keep them in good condition and in working order, or to give notice that they are not operating, since if such a signal is misunderstood it is a menace."

It is true that a lighted flare thrown upon the highway from a moving locomotive does not have the fixity or permanency of a mechanical contrivance, nor does it necessarily convey the same kind or amount of warning which a flagman might be able to give; nevertheless, the principle involved in the several instances is the same so far as established custom and reliance thereon by the public are concerned.

In our opinion, the entire combination of circumstances, as narrated above, presented a question of fact, and not one simply of law, (1) as to whether the crossing was one of unusual danger; (2) as to whether the appellant upon this occasion was negligent in failing, if it did fail, to throw out a lighted flare upon the highway; and (3) as to whether or not an ordinarily pru-

dent person, occupying the position of the *decedent,* would thereby be lulled into a false sense of security by impliedly assuring him that no train was crossing the highway and thus inviting him to proceed with his host over the crossing.

■ ■ The second general question involved upon the appeal relates to the alleged contributory negligence of the deceased. What is herein said on this question relates solely to the decedent Cox, who was a guest in the automobile, and not to Jensen, the driver. Appellant's contention is that Cox was guilty of contributory negligence as a matter of law, defeating recovery by his estate, because he made no protest to Jensen relative to the speed of the automobile and did not call Jensen's attention to the presence of the train upon the crossing or to the two reflector signs along the highway. There is no evidence in the record from which it reasonably can be inferred that Cox knew any more definitely than did Jensen that they were in the vicinity of the crossing, or that Cox saw either of the signs or the train.

It is true that, under some circumstances, an accompanying passenger in an automobile has an obligation to warn the driver of an impending danger. On the other hand, such passenger cannot be held guilty of contributory negligence as a matter of law in failing to warn the driver unless the passenger has some degree of authoritative control over the operation of the automobile or some special knowledge of the impending danger, apart from the knowledge of the driver, or unless the driver's negligence is so manifest that it cannot go unnoticed by the passenger. *Haaga v. Saginaw Logging Co.,* 165 Wash. 367, 5 P. (2d) 505; (on rehearing) 169 Wash. 547, 14 P. (2d) 55. The evidence in this case would not justify a holding that the failure of Cox to warn Jensen constituted contributory negligence as a matter of law. It was, at best, a question of fact for the jury.

Our determination of the two general questions heretofore discussed disposes of a considerable number of appellant's twenty-seven assignments of error, but still leaves other questions to be decided.

Upon the third general question involved in the appeal, appellant assigns a number of errors based upon certain instructions given by the trial court, upon the refusal to give other instructions requested by appellant, and upon the refusal to withdraw from consideration by the jury certain allegations of negligence on which it is contended there was not sufficient evidence to present an issue of fact.

█ Appellant excepted to instructions numbered three and eight as given by the trial court. Instruction number three related to the life expectancy of respondent's intestate, Cox. The ground for assigning error on this instruction is that no mortality table was introduced in evidence.

It is the law in this state that the court takes judicial notice of standard mortality tables and, where the matter is pertinent to the inquiry before it, may properly inform the jury as to the expectancy of life of the person concerned, without taking evidence on the subject. *Roalsen v. Oregon Stevedoring Co.*, 147 Wash. 672, 267 Pac. 433.

█ Instruction number eight advised the jury generally that, if "the operators of said train were negligent in the manner and way alleged by the plaintiff [respondent]," appellant would be liable. The allegations of negligence contained in the complaint include charges of insufficient air brakes, inadequate signal devices, failure to stop, and failure to provide *suitable* flares. The evidence upon these various matters was not sufficient to present issues for consideration by the jury, and the instruction was therefore technically erroneous. However, the court in a later instruction withdrew the issue of insufficient air brakes. As to the charges of inadequate signal devices and failure to

stop, we are satisfied from a reading of the record that the jury was not in any way influenced thereby. The question of suitable flares, however, is of more serious concern in another respect and will be dealt with separately a little later herein.

 Appellant requested an instruction directing the jury to disregard evidence of other accidents at the crossing. The only testimony upon that subject was a voluntary remark by one of appellant's own witnesses on cross-examination wherein she stated that "there has been several accidents there." When respondent's counsel attempted to pursue the subject, appellant's attorney objected, and counsel for respondent thereupon withdrew the question which he had just propounded. That ended the inquiry upon the matter, without any further request from appellant. Under the circumstances shown, refusal to give the requested instruction at the conclusion of all the evidence was not prejudicial error.

 Appellant further requested the court to instruct the jury to disregard any testimony which it believed to be "contrary to the physical facts of the case." The request was founded upon the doctrine that, where the physical facts are uncontroverted and speak with a force that overcomes all testimony to the contrary, reasonable minds must follow the physical facts and therefore cannot differ. *Mouso v. Bellingham & Northern R. Co.*, 106 Wash. 299, 179 Pac. 848; *DeVore v. Longview Public Service Co.*, 162 Wash. 338, 298 Pac. 717; *Morris v. Chicago, Milwaukee, St. P. & Pac. R. Co.*, 1 Wn. (2d) 587, 97 P. (2d) 119, 100 P. (2d) 19.

While the requested instruction might with propriety have been given as a precautionary admonition to the jury, the failure to give it does not, in our opinion, constitute reversible error. In all the cases wherein that doctrine was announced by this court, it was invoked as the basis for setting aside a verdict which the court itself found to be contrary to the physical facts.

■ At the close of respondent's final argument to the jury, appellant moved for an order of mistrial because of opposing counsel's remark that "None of the Polsons have been here in the trial of this case." It is contended by appellant that this was an indirect method of telling the jury that the Polsons were insured and hence had no interest in the outcome of the case.

We think that from any point of view the remark was improper, but we do not think it injected the question of insurance. In any event, however, we do not consider that the statement of itself constituted such misconduct as to call for the declaration of a mistrial.

We come now to what we consider the vital question relating to appellant's motion for new trial. At the conclusion of all the evidence, appellant requested the court to withdraw from the jury the issue of negligence based on the alleged failure of the appellant to give bell or whistle signals. The court refused the request, and thereafter in its instructions not only included that element of negligence as one of the issues involved, but also advised the jury that, if the appellant failed to give such signals, it would be guilty of negligence as a matter of law and would be liable in damages to anyone whose injury was a natural and proximate result thereof.

■ Rem. Rev. Stat., § 2528 [P. C. § 9091], provides:

"Every engineer driving a locomotive on any railway who shall fail to ring the bell or sound the whistle upon such locomotive, or cause the same to be rung or sounded at least eighty rods from any place where such railway crosses a traveled road or street on the same level (except in cities), or to continue the ringing of such bell or sounding of such whistle until such locomotive shall have crossed such road or street, shall be guilty of misdemeanor."

The failure to give such signals, as required by the statute constitutes negligence as a matter of law. *Mc-*

*Kinney v. Port Townsend & P. S. R. Co.,* 91 Wash. 387, 158 Pac. 107; *Schofield v. Northern Pac. R. Co.,* 4 Wn. (2d) 512, 104 P. (2d) 324.

Such negligence, however, to be actionable, must not only be alleged, but also proved by a preponderance of the evidence. As pointed out in the early part of this opinion, the only evidence purporting to prove that these signals were not given is the testimony of Jensen, the driver of the automobile, who merely stated that he did not hear any whistle or bell. He did not testify that the signals were not given. On the other hand, there was an abundance of testimony, from both interested and disinterested witnesses, that the bell was rung and the whistle blown timely and repeatedly.

 This court has repudiated the so-called "scintilla of evidence" rule and has repeatedly held that evidence sufficient to support a verdict must be substantial. *Davison v. Snohomish County,* 149 Wash. 109, 270 Pac. 422; *Dunsmoor v. North Coast Transportation Co.,* 154 Wash. 229, 281 Pac. 995; *Hansen v. Continental Cas. Co.,* 156 Wash. 691, 287 Pac. 894; *Cartwright v. Boyce,* 167 Wash. 175, 8 P. (2d) 968; *De-Temple v. Schafer Bros. Logging Co.,* 169 Wash. 102, 13 P. (2d) 446; *Femling v. Star Publishing Co.,* 195 Wash. 395, 81 P. (2d) 293, 84 P. (2d) 1008; *Poland v. Seattle,* 200 Wash. 208, 93 P. (2d) 379; *Hauswirth v. Pom-Arleau,* 11 Wn. (2d) 354, 119 P. (2d) 674.

In the *Poland* case, *supra,* we quoted with approval the following paragraph from the case of *Chicago & N. W. R. Co. v. Andrews,* 130 Fed. 65:

" 'Where the attention of those testifying to a negative was not attracted to the occurrence which they say they did not see or hear, and where their situation was not such that they probably would have observed it, their testimony is not inconsistent with that of credible witnesses who were in a situation favorable for observation, and who testify affirmatively and positively to the occurrence. There is then no conflict.' "

In the *Hauswirth* case, *supra,* we made this statement:

"The only evidence offered by respondent [plaintiff] upon that issue [lights] was the testimony of Richard Hauswirth, who merely stated that he saw no lights. That evidence was purely negative in character, had no more than a speculative value, and did not constitute substantial evidence within the rule requiring that a finding or verdict must be supported by a preponderance of the evidence. *Poland v. Seattle, supra,* and cases therein cited. On the other hand, there was positive, affirmative evidence that the lights were burning at the time.

"In view of the definite testimony that the lights were burning, and in further view of the absence of substantial evidence to the contrary, we must hold that the only finding that properly could have been made upon that issue was that the lights of the Pom-Arleau car were burning at, and immediately before, the time of the collision."

Respondent contends that, under the evidence, it was properly a question for the jury to determine whether or not such signals were given, and cites as authority for her position the following cases from this court: *McKinney v. Port Townsend & P. S. R. Co.,* 91 Wash. 387, 158 Pac. 107; and *Kent v. Walla Walla Valley R. Co.,* 108 Wash. 251, 183 Pac. 87. In those cases, however, and in others of similar import, it was shown that the witnesses whose testimony was negative were so situated that, in the ordinary course of events, they would have taken cognizance of the disputed fact had it occurred, or that they had full and accurate knowledge of the facts concerning which they testified.

That is not the situation here. According to Jensen's own testimony, he was not aware of the fact that he was in the immediate vicinity of the railroad signs or the crossing. The uncontroverted facts demonstrate that, at the time the signals were required to be given, Jensen's automobile was a half-mile or a mile away.

He was driving in an enclosed car, and a heavy rain storm prevailed. He was relying wholly on the presence or absence of a flare in the road to indicate the presence of the train on the crossing. According to his testimony he did not even see the reflector signs on the side of the highway.

On the other hand, appellant's witnesses, disinterested as well as interested, were in a position to observe and know whether the signals were given. They all testified positively that the whistle and bell were sounded repeatedly in the immediate vicinity of the crossing. In view of the definite, positive testimony that the bell was rung and the whistle blown, and in further view of the absence of any substantial evidence to the contrary, we must hold that the only conclusion that properly could have been drawn from the evidence was that the required signals were given.

Since the verdict was general, we do not know how the jury arrived at its conclusion. It may have found from the conflicting evidence that in fact the flare was thrown upon the highway, yet may have concluded from Jensen's negative testimony that the statutory warning signals were not given. It may have been in doubt both as to whether a flare was thrown and as to whether the signals were given, but, taking the two questions together, may have resolved the doubt as to the whole in favor of respondent. Some of the jurors may have rested their verdict on the absence of a flare, and others upon the alleged failure to give the statutory signals. True, the jurors as a whole may have found that no flare was thrown upon the highway, but in determining whether that was the proximate cause of the accident and the resulting injuries they should not have been allowed to consider an alleged proximate cause upon which there was no substantial proof. In other words, appellant was entitled to have the jury consider only such issues as were properly supported by the evidence. The submission of the issue of statu-

tory warning signals constituted prejudicial error and calls for the granting of a new trial.

 In view of our disposition of the appeal, two other matters should be considered. The complaint alleged, as one of the grounds of negligence, that appellant's employees were not supplied with "suitable" flares. Appellant requested an instruction that, as a matter of law, it was not required to furnish flares different in kind from those shown by the evidence to have been furnished by it. The requested instruction was refused.

As heretofore shown, appellant was under no legal or statutory obligation to give signals by flares of any kind. Its obligation in that respect could be, and was, predicated solely upon the basis of its failure to give the flare signal in accordance with the custom which appellant itself had established. While there may be some different kind of flare which, for purposes of warning the public, is preferable to that of oil soaked engine waste such as was actually used by appellant, there was no obligation upon appellant to use a more improved type. We think that an instruction substantially in the form requested by appellant should have been given.

 Appellant further requested an instruction which, in substance, advised the jury that if it found that by reason of the inclement weather at the time in question the vision of the occupants of the automobile was obscured or impaired, then it became the duty of the decedent to observe a degree of caution in proportion to the added danger. We think the instruction correctly stated the law, was applicable to the facts, and therefore should have been given.

Other errors assigned by appellant we do not separately discuss, for the reason that they are either sufficiently covered by what we have already said, or else are without substantial merit.

The judgment is reversed, with direction to the trial court to grant a new trial.

SIMPSON, C. J., ROBINSON, JEFFERS, and GRADY, JJ., concur.

BLAKE, MILLARD, and MALLERY, JJ. (dissenting)—We think the judgment should be affirmed.

BEALS, J. (dissenting)—I am in accord with the majority opinion, save in so far as it is held that the jury should pass upon the question of whether or not appellant was negligent in failing, if it did so fail, to throw out a lighted flare upon the highway, and whether or not an ordinarily prudent person occupying the position of the decedent would, under the testimony, be lulled into a false sense of security by relying upon the fact that, upon crossing highways, appellant's employees did frequently throw from its trains lighted flares.

James A. Jensen, the driver of the automobile in which decedent was riding, testified that he had several times driven over this road, and knew of the crossing of the highway by appellant's railroad. He also stated that he had a general knowledge of the crossing and its location, but upon the night in question was not aware that he was in the immediate vicinity of the crossing until a moment before the collision. He also testified that he relied upon being notified of the presence of a train upon the track by the presence of a lighted flare upon the highway, and that, seeing no flare, he proceeded at a sustained speed of about thirty-five miles per hour.

As stated by the majority, the throwing of flares from the train was not required by any statute or departmental regulation. This was purely a voluntary act performed by the train crew out of abundant precaution to warn traffic on the highway.

In this state we have many laws and regulations gov-

erning the matter of fires in forest areas. By Rem. Rev. Stat. (Sup.), § 5788 [P. C. § 2565], the burning of forest material within any county in the state in which there is a warden or ranger, during the period beginning April 15th and ending October 15th of each year, without first obtaining permission in writing, is prohibited, the period referred to being designated as the "closed season."

By Rem. Rev. Stat., § 5791 [P. C. § 2568], any person who, without a permit, during the closed season, kindles a fire in or dangerously near any forest material, except for necessary lumbering operations, etc., is subject to fine.

The first paragraphs of §§ 5795 and 5795-2 [P. C. §§ 2572 and 2572-2], respectively, read as follows:

"No one operating a railroad shall permit to be deposited by his, or its, employees, and no one shall deposit during the closed season, fire or live coals upon the right of way outside of the yard limits, and within one-quarter of one mile of any forest material, without such deposit of fire or live coals shall be immediately extinguished."

"It shall be unlawful during the closed season, for any person to throw away any lighted tobacco, cigars, cigarettes, matches, fire-crackers, or other lighted material in any forest brush, range, or grain areas in this state."

By Rem. Rev. Stat. (Sup.), § 5794 [P. C. § 2571], it is made unlawful to operate, during the closed season, a spark-emitting logging locomotive, unless the locomotive is equipped with a suitable spark arrester, a power pump and hose, and a sprinkler system.

Rem. Rev. Stat., § 2523 [P. C. § 8844], reads as follows:

"Every person who shall willfully or negligently set, or fail to carefully guard or extinguish any fire, whether on his own land or the land of another, whereby the timber or property of another shall be endangered, or who shall fail to respond to any lawful

summons to aid in guarding or extinguishing any fire, shall be guilty of a misdemeanor."

It would seem, then, that, during the six months following April 15th, the use of flares such as those with which we are here concerned, in the area in which the accident occurred, is absolutely prohibited by law. During other periods of dry weather it might well be dangerous and subject the railroad company to actions for damages or penalties.

While the accident which occasioned this lawsuit occurred in January, it seems to me that a custom which can be lawfully followed for not more than six months in the year cannot become such an established custom as would justify travelers along the highway in relying thereon, to the exclusion of ordinary precautions which drivers of automobiles should take upon approaching a known railroad crossing. Many dark, stormy nights occur during the "closed season," and such a custom as this, which may be lawful April 30th and be unlawful the next day, seems to me to be of too uncertain a nature to afford foundation for the rule laid down in the majority opinion.

In the case of *Rhine v. Duluth, M. & I. R. R. Co.*, 210 Minn. 281, 297 N. W. 852, the supreme court of Minnesota in discussing questions very similar to those here presented, said:

"The essential elements of a custom are stated in *C., M. & St. P. Ry. Co. v. Lindeman* (8 Cir.), 143 F. 946, 949, thus:

" 'A custom has the force of law, and furnishes a standard for the measurement of many of the rights and acts of men. It must be certain or the measurements by this standard will be unequal and unjust. It must be uniform; for, if it vary, it furnishes no rule by which to mete. It must be known, or must be so uniform and notorious that no person of ordinary intelligence who has to do with the subject to which it relates and who exercises reasonable care would be ignorant of it; for no man may be justly condemned for the

violation of a law or a custom which he neither knows nor ought to know. In short, a binding custom must be certain, definite, uniform, and known, or so notorious that it would have been known to any person of reasonable prudence who dealt with its subject with the exercise of ordinary care.'

"These were the tests of custom applied in *Salisbury v. New York Cent. R. Co.*, 220 App. Div. 491, 222 N. Y. S. 38; *Matarani v. Reading Co.*, 119 N. J. L. 43, 194 A. 246. A custom must be clearly proved, and where evidence is uncertain and contrary the custom is not established. 17 C. J. page 522.

"It is contrary to common sense that a straightaway or through train movement should be stopped to put out flares on both sides of the railroad crossing. It is obvious that a train's progress over such crossings would be so hampered as to be an impractical method of operating a railroad. Such being the case, proof of a custom cannot rest on such testimony as was here presented. The trial court was right in its rulings that no such custom was established."

In the case cited, the defendant's witnesses testified that warning flares were placed on the highway during switching operations, but not to give notice of the presence of an ordinary through train. In the case at bar, appellant's agents met the proposition suggested by the supreme court of Minnesota in the last paragraph quoted, by throwing the burning waste from moving trains, but, in my opinion, this simply adds another element of uncertainty to the effectiveness of the warning of the presence of the train.

Such flares are at best a very uncertain method of giving warning of the presence of a train. It does not appear that it was the custom of the engine crew to throw a flare upon the road on each side of the train, and at least under some circumstances a flare on one side of the track might be a very doubtful warning to automobiles approaching from the other side of the track. Under such circumstances, the extent of the warning given by the flare would largely depend upon the brightness of the flame and its position on the high-

way. Certainly the flame of such a flare would not be very intense or long lasting, else it might well cause damage. Apparently the length of time the flares would burn is uncertain. They were simply casual handfuls of waste, carrying some oil, and after being lighted were thrown or kicked from the engine as it proceeded to cross the highway. Doubtless such flares would vary considerably in the degree of the warning which they would give, depending upon the waste and the amount of oil which it had absorbed. While there is testimony in the record to the effect that the flares would not be put out by rain, it would seem that their visibility might at least be reduced by rain falling upon them. Kicked from a moving engine, the flares might or might not light in a conspicuous position on the highway.

Appellant's witnesses stated that upon the night in question a flare was thrown from the engine, and both interested and disinterested witnesses testified that it was burning after the collision occurred. As stated by the majority, however, the record contains evidence which would support a finding by the jury that, upon the occasion of the accident, no flare was burning.

The majority hold that the testimony concerning these flares presents a question upon which the jury should pass, as to whether or not one in decedent's position would have been justified in relying upon seeing a flare if a train was occupying the track. In support of its conclusion that this question should be passed on by the jury, the majority cite several authorities and the general rule quoted in *Ray v. Hines,* 118 Wash. 530, 203 Pac. 929, from 33 Cyc. 946, to the effect that, where a flagman is employed or a gate established, whether such duty is imposed by statute or not, the railroad may be liable if the person in charge fails to perform his duty.

In my opinion, the authorities cited are not here controlling, because a gate or a wigwag device or the usual

presence of a flagman are all substantial, permanent, and definite methods of giving notice of the approach or presence of a train, and persons customarily using the road would naturally rely upon such notice, not knowing, of course, whether the presence of the gate, signal, or flagman was or was not required by law or regulation.

Of course, the presence and operation of a flagman, gate, or a wigwag device would not be dependent upon the season of the year, but would function at all times and seasons.

In the case of *Dunlap v. Pacific Electric R. Co.,* 12 Cal. App. (2d) 473, 55 P. (2d) 894, a directed verdict in favor of the defendant was affirmed on appeal. It appeared that one Gussie Dunlap, while riding as a passenger in an automobile, was killed as the result of a collision between the automobile and an electrically propelled train of freight cars, operated by the defendant. A wigwag signal was in position, which commenced to function when an approaching train was several hundred feet from the crossing. The signal, however, ceased to operate when the head of the train reached a point 108 feet from the center of the highway at the intersection. The driver of the automobile testified that his first notice of the presence of a passing train was when he saw a box car, but that he saw no lights nor heard any sound from a functioning wigwag signal. His testimony was supported by other witnesses. On appeal, plaintiff contended that the defendant should have given other notice of the presence of a moving train. The judgment entered upon the directed verdict was affirmed.

In the case of *Toledo Terminal R. Co. v. Hughes,* 115 Ohio St. 562, 154 N. E. 916, the supreme court of Ohio affirmed a judgment in favor of the defendant, entered upon a directed verdict, holding in effect that the driver of an automobile, approaching a railroad crossing at which he knows that an automatic warning signal is

maintained, while entitled to place some reliance upon the indication of safety which silence of the signal implies, is nevertheless bound to use such care in addition as an ordinarily prudent man would use under such circumstances. The trial court dismissed the case upon the opening statement of plaintiff's counsel. From this statement it appears that at the time of the accident it was foggy, that the train was stationary, and that an existing traffic signal which operates by swinging, flashing a light, and ringing a bell, was not functioning. The court called attention to the fact that the plaintiff knew of the existence of the railroad crossing, and that, notwithstanding the fact that he was not warned by the mechanical signal devices, he was guilty of contributory negligence as matter of law.

In the case of *Gallagher v. Montpelier & Wells R. R.*, 100 Vt. 299, 137 Atl. 207, 52 A. L. R. 744, the supreme court of Vermont affirmed a judgment entered upon a verdict in favor of the defendant in an action for damages sustained by the plaintiff while riding as a passenger in an automobile operated by her brother. The court called attention to the essential difference between cases in which the traveler on the highway was induced by the lack of a warning signal "to go upon a clear, and apparently safe, crossing in front of an approaching train by which he was struck and injured," and cases such as the one under consideration, where

" . . . the traveler ran into a train already occupying the crossing, which train of itself was notice of existing danger. The plaintiff could not assume that the crossing was clear when it was in fact obstructed."

The very nature of the casual handful of lighted waste thrown from a moving train is such that persons should not be entitled to rely thereon, and that one be allowed to recover against the railroad upon no basis other than testimony to the effect that upon the occa-

sion of the particular accident no flare was burning, it seems to me is without warrant of law.

Such a rule penalizes one who makes an unusual effort, not required by law, to protect the public. The very nature of the flare is such that its operation is at best uncertain, and at some seasons it cannot be employed at all.

I accordingly dissent from so much of the opinion of the majority as holds that the testimony introduced by respondent, to the effect that on the night in question no flare was burning, affords any basis for a finding by a jury that appellant was in any way negligent in law.

[1]Reported in 138 P. (2d) 195.