[No. 25945.   Department One.   April 13, 1936.]

MARY L. GATTERDAM, *Respondent*, v. THE DEPARTMENT OF LABOR AND INDUSTRIES, *Appellant*.[1]

[1]Reported in 56 P. (2d) 693.

*The Attorney General* and *J. A. Kavaney, Assistant,* for appellant.

*Vanderveer & Bassett* and *Graham K. Betts,* for respondent.

GERAGHTY, J.—This is an appeal from a judgment entered upon the verdict of a jury awarding the respondent compensation, under the workmen's compensation act, for the death of her husband consequent upon injuries sustained in extrahazardous employment.

The deceased husband, while in the course of his employment, on October 21, 1929, had his great toe crushed. On the following day, he filed his claim for compensation with the department. The claim was recognized and payment made for time loss and medical aid. He later returned to work, and his claim was closed. Subsequently, osteomyelitis developed in the injured foot, and the claim was reopened and further treatment rendered, including several successive amputations, the last removing a portion of the foot. These operations were performed at various times from 1930 until 1933.

He suffered great pain, and during much of the time, morphine was administered to him. He had been taking morphine steadily for three months preceding his death. His suffering was so great that, while in the hospital under treatment, he had said to friends that, if it were not for his family, he would be tempted to commit suicide. January 10, 1934, his dead body was found in the bathroom of his home, with a bullet wound in his head and a revolver in his hand.

The revolver had been kept, unloaded, in a closet in

the bathroom for a long time. The shells were hidden in the closet, out of reach of the children.

The widow filed her request for a pension, pursuant to the terms of the act. The application was denied by the department, and, upon rehearing before the joint board, the order was approved, whereupon this action was brought.

Upon the request of the respondent, the court impaneled a jury to try the issues of fact in the case. The denial by the court of its motion to quash the demand for a jury is the first error assigned by appellant.

The section of the workmen's compensation act relating to appeals to the superior court provides:

"The calling of a jury shall rest in the discretion of the court, except that in cases arising under section 7683 and 7690 either party shall be entitled to a jury trial upon demand." Rem. Rev. Stat., § 7697 [P. C. § 3488].

The controlling issue in the case was one of fact, and the calling of the jury was within the discretion of the court. *Kelly v. Department of Labor & Industries,* 172 Wash. 525, 20 P. (2d) 1105.

The assignment based upon the refusal of the court to exclude the claimant and her children from the courtroom is without merit. "The placing of witnesses under the rule is a matter within the discretion of the trial court." *Wiles v. Northern Pac. R. Co.,* 66 Wash. 337, 119 Pac. 810. Apart from this, the claimant was herself a party to the action, and her children were interested, since the amount of her award would be increased by the statutory allowance for dependent children.

Error is assigned upon the giving of certain instructions. These instructions are not set out in the brief, as required by Rule of Court VIII, paragraph 2,

159 Wash. xliii, which provides: ''Where an objection is based on an instruction of the court, the instruction shall be set forth in the brief in full.'' The instructions, embodied in the transcript, are unexceptionable and will be later referred to in our discussion of the main issue in the case.

There remains the question whether the evidence warranted the verdict of the jury that the self-inflicted death of the respondent's husband was directly traceable to his injury. The contention of the appellant is that Gatterdam's act of self-destruction was an intervening, and the proximate, cause of his death.

In *Hepner v. Department of Labor & Industries,* 141 Wash. 55, 250 Pac. 461, the court had under consideration a case where a workman was injured in extra-hazardous employment. The injury resulted in his insanity, and while in that condition, he walked into a moving train and was killed. The court concluded that there was sufficient evidence to go to the jury upon the question whether the injury complained of produced insanity, as a result of which the decedent came to his death:

''The complaint alleged that decedent, in an insane condition, wandered upon the track and was killed. The jury so found by their verdict. Appellant now urges that it was just as reasonable to suppose that decedent went walking for exercise, or went to pile the bark, and, being negligent and unmindful of the dangers, was struck by the train; or that, in the alternative, he may have committed suicide. But all those suggestions leave out of consideration the important fact, fully established by the evidence, that at the time in question the decedent's mind was in an insane condition. There was testimony showing that the decedent did not want to go to a hospital, because he thought the nurses and doctors were trying to do away with him; that he was inclined to hide when visitors came to the house; that he thought his friends were

down on him; that he would not go out doors, unless some one went along; that he would follow his wife around like a child, and had to be treated like a child. The evidence was all but conclusive that decedent was insane; and, from the testimony given by medical experts, it was shown that his state of mind was that of a child. If his mind was in the condition shown by the evidence, it is, of course, apparent that he could not commit suicide, as that term is usually used to indicate the action of a person who is able to weigh and appreciate the thing about to be done; or, as was said in *Case of Sponatski*, 220 Mass. 526, 108 N. E. 466, L. R. A. 1916A 333:

" ' . . . a voluntary wilful choice determined by a moderately intelligent mental power which knows the purpose and the physical effect of the suicidal act. . . .' "

In the case before us, we have evidence, both lay and medical, upon which the jury could have found that Gatterdam's injury produced insanity, which drove him to the act of self-destruction, and that the act was not the result of "a voluntary wilful choice determined by a moderately intelligent mental power which knows the purpose and the physical effect of the suicidal act." The case was tried to the jury, upon the record made at the rehearing before the joint board. This included the testimony of the claimant and several other witnesses who had observed Gatterdam, as well as the testimony of the physician who attended him throughout the greater portion of his long illness. The lay witnesses testified to numerous instances when Gatterdam acted in an irrational and irresponsible manner; that he had frequent lapses of memory and did things he was not conscious of doing.

Dr. U. C. Bates, the attending physician, whose qualification was admitted by the department, testified that the deceased suffered great pain, and it was necessary to give him morphine for a long-continued period; that

he had been taking the drug regularly for about three months preceding his death; that the constant use of morphine, with the intense pain, and the infection, reduced his physical resistance; that he lost weight and sleep, became mentally unbalanced, and lost his memory.

On cross-examination, Dr. Bates testified that he saw the deceased either the first or second day before the suicide; that he was not rational at that time; that his statements were confused, and his answers to questions erratic and irrational.

"Q. What did you ask him and what were his answers to the questions? A. I don't remember the details of the questions but in a general sense he was confused. Q. At that time he wasn't insane? A. Well, I think he had a toxic psychosis at that time. Q. What do you mean by toxic psychosis? A. I mean insanity due to the infectious process, the use of morphine plus the continued pain. Q. He had toxic insanity? A. Yes. . . . Q. Doctor, would you say if a man was insane he would be capable of planning his death? A. Certain forms of insanity they certainly do plan their death. Q. That would indicate he was rational and knew what he was doing? A. Not necessarily at all. Lots of insane people have to be watched or they will commit suicide, especially the melancholic brand. Q. But he would be rational enough to know what he was doing? A. Many insane people are rational at times. . . . Q. You couldn't say this man was insane at the time he committed suicide unless you were present at that particular moment and able to watch his actions and reactions? A. No, but from my knowledge of the case and study of him, and intimate association with him, leads me to believe he was insane. . . . Q. But how were you able to arrive at the diagnosis of toxic psychosis? A. The injury, plus the long continued infection, plus the morphine, plus the intense pain, plus the irrational things this man did up to the time of his death and including his suicide. . . . Q. Now, Doctor, upon how many occasions did you say after this

man's discharge from the hospital, his actions appeared irrational to you? A. Well, practically every time he came to see me he acted irrational some part of the examination. . . . Q. Is it your opinion this man was constantly and steadily insane . . . during the time between August, 1933, and the time of his death? A. He was probably gradually becoming insane, which reached its culmination about the time he committed suicide.''

In *Delinousha v. National Biscuit Co.*, 248 N. Y. 93, 161 N. E. 431, the court of appeals of New York, in passing upon a case similar in its features to the one under consideration, said:

''Concededly if an injury causes insanity which in turn causes suicide, death benefits may be awarded under the provisions of section 10 of the Workmen's Compensation Law (Cons. Laws, ch. 67). Here the finding is to the effect that the injury suffered by the deceased caused him to 'develop and suffer from a psychosis' which caused him to commit suicide, 'his death being naturally and unavoidably the result of the injuries which he sustained' and that it 'resulted from an uncontrollable impulse and without conscious volition to produce death.' . . .

''While helpful, the decisions as to insurance policies are not strictly analogous to claims arising under the Workmen's Compensation Law. The courts there are attempting to decide the meaning of an ambiguous clause in a contract. What was the intent of the parties. But here we deal with a statute intended to redress the incidence of that economic loss inevitable in industry. It is to be construed liberally. Death benefits are allowed if the injury results naturally and unavoidably in disease and the disease causes death. This is so if the injury causes insanity from gangrenous poisoning or otherwise, and the insanity directly causes suicide—in other words, if the suicide is not the result of discouragement, of melancholy, of other sane conditions, but of brain derangement. If that is the cause an award may be made. Death is then the proxi-

mite and direct result of the accident within the meaning of the statute."

In submitting the case to the jury, the trial court charged:

"No. 4. In order for the plaintiff here to recover a verdict, it is necessary that the plaintiff prove to your satisfaction, by a fair preponderance of the evidence, that the death of the decedent was not accidental; and secondly, that the death was occasioned by suicide of the decedent while insane, and third, that such insanity was proximately caused by the injury which the decedent had sustained in 1929 and the subsequent developments from such injury. . . .

"No. 8. If you find from a preponderance of the evidence that the plaintiff's husband killed himself as a result of an uncontrollable impulse, or while in a delirium caused by the pain he was suffering, or from the use of narcotics prescribed as treatment, if any, for his injury; then, in contemplation of law, he was insane.

"No. 9. You are instructed that an uncontrollable impulse is that action of the body, in no way guided by the mind, which may cause the individual to execute a completed act where there is no direction from the mind, in other words, if there by any direction of the mind controlling the chain of events or any part of them then the same is not an uncontrollable impulse and unless the death of Claude H. Gatterdam was the result of an uncontrollable impulse, in no way directed by the mind, then the plaintiff cannot recover and your verdict should be for the defendant.

"No. 10. You are instructed that if you find from the evidence that the deceased procured the gun from the closet and loaded the same with the intention of taking his own life, then the subsequent act of taking his own life was but the culmination of a pre-designed intent and this would not be an uncontrollable impulse and the plaintiff cannot recover."

These instructions clearly informed the jury of the facts to be found, necessary to a recovery by the respondent. In the light of these instructions, the jury

must have found, and there is some evidence in the record warranting the finding, that Gatterdam took his own life as the result of an uncontrollable impulse or while in the delirium caused by the pain he was suffering, and the diseased condition of his mind, all having their origin in the injury to his foot.

The appellant calls attention to the statements made by the deceased that, if it were not for his family, he would end it all by committing suicide. These statements cut both ways. They indicate that in his saner period he was restrained by the thought of the consequences to his family. It might, with reason, be argued that the final act evidenced a mental condition in which he was incapable of appreciating the consequences, either to himself or to his family.

The judgment will be affirmed.

MILLARD, C. J., TOLMAN, MITCHELL, and STEINERT, JJ., concur.