[No. 37793. En Banc. August 4, 1966.]

DOROTHY E. SCHWAB, *Appellant,* v. THE DEPARTMENT OF LABOR AND INDUSTRIES, *Respondent.**

*Walthew, Warner & Keefe,* by *James E. McIver,* for appellant.

*The Attorney General, Virginia O. Binns* and *Wesley G. Hohlbein, Assistants,* for respondent.

DONWORTH, J.—This case involves a claim for a widow's pension under the Workmen's Compensation Act filed by the widow of a deceased worker. The widow is plaintiff-appellant. Her claim was rejected by the Department of Labor and Industries because the supervisor found that the workman died from causes "entirely unrelated to his industrial injury or his medical treatment therefor." She appealed to the Board of Industrial Insurance Appeals, which, after numerous hearings, entered an order sustaining the action of the department. Thereafter, the widow appealed to the Superior Court for King County, which refused to submit the question of causation of the worker's death to

*Reported in 417 P.2d 613.

the jury, but ruled, as a matter of law, that the death of the worker was not caused by a prior industrial accident. From the dismissal of her appeal, the widow has appealed to this court.

The basic question in this appeal is whether there was sufficient evidence, when viewed in the light most favorable to plaintiff-appellant's theory, to submit to the jury as a question of fact, whether the compensable injury which the decedent suffered on May 24, 1956, was the proximate cause of his death in 1959.

Robert W. Schwab, the decedent, was injured (back injury) on May 24, 1956, while working for W. P. Fuller Company. This back injury was covered by industrial insurance. He was confined in the hospital from a few days after the injury until September 9, 1956.

While confined in the hospital, Mr. Schwab received conservative treatment for about the first 10 days. When this proved ineffective, Mr. Schwab received X rays and a myelogram in an attempt to diagnose the nature and severity of his injuries. On June 25, 28, and July 2, and 9, Mr. Schwab received epidural injections in an attempt to give him some relief. Finally, on July 27, 1956, Mr. Schwab received a hemilaminectomy and foramenectomy. After this operation, Mr. Schwab stayed in the hospital and received further conservative treatment (medication and physiotherapy). September 9, 1956, he was discharged.

Mr. Schwab continued to receive outpatient and hospital care for this injury until his claim was closed, on September 8, 1958, by the Department of Labor and Industries, with an award for a permanent partial disability of 25 per cent of the maximum allowable for unspecified disabilities ($1,500).

An appeal from this order was taken on November 13, 1958, and on February 27, 1959, the Board of Industrial Insurance Appeals "modified" the department's order by reversing the closure of the claim and ordering it reopened for further medical treatment.

After Mr. Schwab's claim was reopened, the treatment of

the back condition was resumed March 4, 1959, and continued through June 22, 1959, during which interim Mr. Schwab was seen by Dr. Gray a total of 14 times. During that period, Dr. Gray had examined the decedent twice in a very thorough manner—on March 30, 1959, and again on May 5, 1959. It is a fair summary of Dr. Gray's testimony to say that Mr. Schwab complained of constant pain in his back and legs, and that there was physical evidence to justify such pain, in that the vertebrae of the lumbar spine had not been immobilized because the attempted fusion of the vertebrae had failed. (The decedent apparently had at least three laminectomies of the lumbar spine, the last of which was in 1956, after the industrial accident.) Dr. Gray testified that Mr. Schwab was hospitalized for this condition on April 5, 1959. He evaluated Mr. Schwab as a physical and psychological back cripple, who probably could not be helped by surgery and whose main problem was how to obtain relief from pain. Dr. Gray had recommended physiotherapy and medication.

There is considerable testimony from Mr. Schwab's relatives which shows that he had an alcoholic problem which began in the 1940's, and that he had a history of mental instability which began in 1952, with hospital confinements for both his back problems and his alcoholism, and his mental instability. Hospital and medical records show that he had unsuccessfully tried to commit suicide probably at least four, and perhaps as many as eight, times by various means, including the use of sleeping pills, driving his automobile against an abutment, and using razor blades or knives to cut veins or arteries in his arms. All except two of these instances apparently preceded the industrial injury of May 24, 1956.

After the industrial injury, Mr. Schwab apparently tried twice to commit suicide. The first time was in August, 1957, according to the expert witness testifying for the Department of Labor and Industries. The last unsuccessful attempt was on July 14, 1958. Immediately after this event, he was taken to the King County Hospital (Harborview) for emergency restraint. According to the hospital record, the reason

for admission to the King County Hospital at that time was that the decedent had threatened to kill himself because he was in so much pain and was so depressed, and that a knife had to be forced from him by his eldest son. The diagnosis was manic depressive. Mr. Schwab previously had been confined intermittently from 1952 to 1955 in Western State Hospital, twice at his own request, and once by court order. The diagnosis at that institution had been that Mr. Schwab was suffering from manic depressive characteristics, with some schizophrenic pattern appearing in the diagnostic record occasionally. He was "released" by Western State Hospital completely on January 17, 1957, although he had not actually been confined there since August, 1955.

On June 27, 1959, the afternoon and evening before Mr. Schwab took the overdose of sleeping pills, he and his wife had visited with Mr. and Mrs. DeLong. Mr. DeLong was a crew foreman for the Olympia Stone Company, where Mr. Schwab was employed as bookkeeper and cost accountant to the adequate satisfaction of his employer. Mr. De-Long testified that the afternoon and evening was simply a friendly, sociable visit between friends, and that the only problem which developed was that Mr. Schwab had invited Mr. DeLong to have a drink with him from a bottle of liquor that Mr. Schwab had brought in from his car. Mr. DeLong took only one drink, Mr. Schwab took several. Then, after Mr. Schwab had become intoxicated, Mr. De-Long feared that Mr. Schwab would not be able to drive his car if he drank any more, and told him so, and asked him to go home because Mr. DeLong did not wish his family to be exposed to drinking. Mr. Schwab had been jovial but had not been unruly or unacceptable as a guest, except that he was drinking. Mr. and Mrs. Schwab left the DeLong home about 11 p.m. and drove home.

On arriving home, Mr. Schwab telephoned Mr. DeLong and apologized for his drinking at the DeLongs' home without being invited to do so. It was a natural but very remorseful apology. Mr. DeLong thought nothing more about the matter.

At about 1:15 a.m., according to Mrs. Schwab, her hus-

band, being unable to fall asleep, took about six carbrital capsules, which had been prescribed for him a few days before by Dr. Springer for a shoulder condition not related to the back injury of 1956. She testified that her husband, at the time he took the pills, stated that the doctor had given him some sleeping pills but that they were not really sleeping pills and that he was going to prove it, whereupon he took the pills. She became alarmed and telephoned the prescribing physician. Mr. Schwab took at least six more pills while she was telephoning.

At the direction of the physician, Mr. Schwab was rushed to Ballard General Hospital, where his stomach was pumped out and he was given a stimulant. He was then moved to King County Hospital (Harborview), where he remained until August 21, 1959, when he died, never having regained consciousness.

Three doctors testified in answer to lengthy hypothetical questions which purported to include the testimony and documentary evidence in the record, of which not all have been discussed above. The two doctors who were witnesses for appellant were a psychiatrist and a general practitioner. They testified that the 1956 back injury was probably the "major contributing cause" and the "triggering cause" of this man's taking his own life. They testified that "his defenses were down," so that his suicidal tendencies controlled his actions. The psychiatrist testifying for the Department of Labor and Industries testified that he believed that the work injury was only one stress on Mr. Schwab, and that, *if* Mr. Schwab did commit suicide, the industrial injury of 1956 was not a cause.

At the end of the presentation of all the evidence to the jury, the Department of Labor and Industries moved for a dismissal of the case on the ground that the evidence did not show that the deceased was acting under a delirium or from an uncontrollable impulse at the time he took the sleeping pills. The trial court ruled that there was no evidence, including the testimony of appellant's expert witnesses summarized above, which showed the presence of an "uncontrollable impulse."

■ In deciding whether the question of the causation of the death of the deceased should be presented to the jury, the trial court had to keep in mind not only the law applicable to the particular substantive problem involved, but also the basic rule by which the sufficiency of the evidence is to be tested. That rule is expressed very clearly in *Mutti v. Boeing Aircraft Co.,* 25 Wn.2d 871, 877, 172 P.2d 249 (1946). In that case, this court stated:

A challenge to the sufficiency of the evidence, or a motion for nonsuit, admits the truth of the plaintiff's evidence and all inferences which reasonably can be drawn therefrom, and requires that the evidence be interpreted most strongly against the defendant, and in the light most favorable to plaintiff. In the determination of such challenge or motion, even though the plaintiff's evidence is in some respects unfavorable to him, he is not bound by the unfavorable portion of such evidence, but is entitled to have his case submitted to the jury on the basis of the evidence which is most favorable to his contention. *Lindberg v. Steele,* 5 Wn.(2d) 54, 104 P.(2d) 940.

The trial court, in expressing its opinion about the sufficiency, relied on the unbroken line of cases in this jurisdiction which have affirmed jury verdicts or findings of fact made by a trial court in favor of a claimant. These are *Karlen v. Department of Labor & Indus.,* 41 Wn.2d 301, 249 P.2d 364 (1952); *McFarland v. Department of Labor & Indus.,* 188 Wash. 357, 62 P.2d 714 (1936); *Gatterdam v. Department of Labor & Indus.,* 185 Wash. 628, 56 P.2d 693 (1936); *Hepner v. Department of Labor & Indus.,* 141 Wash. 55, 250 Pac. 461 (1926).

This line of cases represents what might be called a court-recognized exception to the provisions of RCW 51.32.020, which reads:

If injury or death results to a workman from the *deliberate intention* of the workman himself to produce such injury or death, or while the workman is engaged in the attempt to commit, or the commission of, a crime, neither the workman nor the widow, widower, child, or dependent of the workman shall receive any payment whatsoever out of the accident fund. (Italics ours.)

When the death follows a prior industrial injury for which compensation has been allowed, and the death may have been an intentional suicide, the meaning of the words "deliberate intention" becomes crucial.

Hence, the real question in this case is, as in the prior cases—assuming for the purpose of this question that the deceased did commit suicide[1]—did he "deliberately intend" to commit suicide as that term is used in the statute?

We cannot agree with the trial court that, by applying the test of *Mutti v. Boeing Aircraft Co., supra,* there is no evidence that the decedent committed suicide as the result of a degree of insanity which made it impossible for the decedent to form a deliberate intention to commit suicide. We believe that the testimony of the expert witnesses on this point shows that the decedent was believed by them likely to commit suicide in view of his past behavior. The appellant's experts stated that his defenses were down, so that his suicidal tendencies controlled his actions. The respondent's expert testified that the "crisis" which *caused* this man to commit suicide was not the 1956 back injury, but rather a combination of his other problems. The trial court emphasized only one part of appellant's expert testimony, which appeared to indicate that persons who are insane may "plot" their own death. This was in response to cross-examination, and not pertaining to the particular decedent in this case. Furthermore, we do not believe that even that testimony necessarily excluded the possibility that the insane person can be said not to form a "deliberate intention" to commit suicide, even if he might plot his own death. The decedent in the *Gatterdam* case, *supra,* "plotted" his own death, in the sense that he loaded his own revolver in his own house, out of sight of his family, after what appeared to be a normal sequence of events with his family, and, with no apparent cause, shot himself in the head. The

[1]If the deceased accidentally killed himself from an overdose of sleeping pills because he was joking or because he was intoxicated, or because he did not know of the deadliness of the combination of alcohol and barbiturates, his death was not causally connected with his industrial injury, and, therefore, no recovery is possible.

expert testimony of his family doctor was that he believed Mr. Gatterdam would not have shot himself except that he was probably suffering from delusions at the time. In view of the *Gatterdam* case, *supra,* we are of the opinion that there is sufficient evidence in this case so that the vital issue of whether the decedent had a deliberate intent to end his life must go to the jury.

Respondent has argued that the evidence of the experts, relied on by appellant in this case, is not adequate because the hypotheticals were defective. The record shows that the hypotheticals were amended in every respect *insisted on* by respondent at the hearings before the hearing examiner. We believe that the trial court came to the same conclusion, in view of the considerable discussion in the trial court record on this point.

Respondent has argued that the testimony of the experts is at variance with the established and uncontroverted evidence in the record, in that this man, during the last 6 months of his life, was steadily employed full time to the adequate satisfaction of his employer, whereas the expert testimony of appellant's witnesses stated (in answer to the hypotheticals), as a basis of their testimony, that the decedent could not adequately hold down a job because of his injury; and that the pain and the failure of treatments and the inability to function at a full-time job took away his defenses to suicide, hence they caused the suicide. We believe that respondent clearly waived this inadequacy, if it exists, in so far as using it to exclude evidence. However, the respondent's argument on appeal challenges the sufficiency of the evidence.

During the hearings before the examiner, respondent's counsel was encouraged by appellant's counsel to ask the question on cross-examination, based on documentary evidence, as to the decedent's total employment time during the last 6 months of his life. This, respondent's counsel declined to do. Under the circumstances, we are unwilling to rule as a matter of law that the testimony is in conflict with the uncontroverted facts in the record, because we think that it is reasonably possible for the jury, if they

believe the testimony of Dr. Gray (who treated the decedent during that period), to find (1) that his back injury did account for his absence from work, which is shown by the time records, and (2) that decedent's back condition caused him such pain and life seemed so hopeless to him that he committed suicide.

Appellant has raised an additional problem in this case, which we do not find it necessary to pass upon at this time. We refer to it only because it will become important on the new trial in formulating the court's instructions to the jury. Appellant has asked this court to abandon the so-called *Gatterdam* rule, and, instead, to accept the reasoning of the case of *Harper v. Industrial Comm'n,* 24 Ill.2d 103, 180 N.E.2d 480 (1962). It is appellant's position that the *Gatterdam* case, *supra,* relies on *Hepner v. Department of Labor & Indus., supra,* which in turn relies on *Sponatski's Case* (also cited as *In re Sponatski* and *Sponatski v. Standard Acc. Ins.*), 220 Mass. 526, 108 N. E. 466 (1915). Appellant argues that the so-called *Sponatski* doctrine, which takes its name from the *Sponatski* case, *supra,* is outmoded and of no practical use in the resolution of the kind of problem involved in this case.

Respondent does not discuss the *Sponatski* case but relies on the *Gatterdam* case, *supra.* Respondent compares the *Gatterdam* case favorably to *Delinousha v. National Biscuit Co.,* 248 N. Y. 93, 161 N. E. 431 (1928), which was cited and quoted in the *Gatterdam* case, *supra.*

On retrial of this case, the court will be called upon to instruct the jury appropriately in the light of these cases and RCW 51.32.020. As appellant has stated (and we agree), there is sufficient evidence to take the case to the jury without a departure from our prior decisions cited herein. We will not pass on the question raised by appellant (asking this court to depart from the *Gatterdam* case, *supra*) until such time as it is squarely before this court.

We hold that, for the reasons stated above, the trial court's judgment of dismissal must be reversed and the cause remanded for a new trial conducted in a manner con-

sistent with this opinion. It is so ordered. Costs of this appeal shall abide the result of the retrial as provided in Rule on Appeal 55 (b) (1).

ROSELLINI, C. J., FINLEY, HUNTER, HAMILTON, and HALE, JJ., concur.

WEAVER, J. (dissenting)—I believe the trial court reached the correct conclusion; hence I dissent.

HILL and OTT, JJ., concur with WEAVER, J.

October 19, 1966. Petition for rehearing denied.