[No. 631-1.     Division Three.     May 1, 1972.]

WILLIAM J. O'DELL, *Respondent*, v. CHICAGO, MILWAUKEE, ST. PAUL & PACIFIC RAILROAD COMPANY, *Appellant.*

*Warren H. Ploeger, James E. Nelson,* and *J. Fred Simpson,* for appellant.

*Hodge & Dalgren, Inc., P.S., A. Wesley Hodge,* and *Charles F. Mansfield,* for respondent.

EVANS, J.—Plaintiff William O'Dell received serious personal injuries when he drove his motorcycle into the side of defendant railroad's freight train at a grade crossing. Based upon an allegation that his injuries were caused by defendant's failure to provide adequate safeguards and warnings, plaintiff recovered a judgment for $180,000. Defendant appeals.

In the early morning hours of August 28, 1965 there was a dense fog in the town of North Bend, Washington, and the streets were wet from an evening rain. This condition was not uncommon to the area. Plaintiff had worked as a bartender in North Bend until midnight, and at approximately 1 a.m. left a restaurant, where he had breakfast, to drive home on his motorcycle. He drove north on Ballarat Street, which is an arterial running in a north-south direction and intersects defendant's railroad tracks at right angles approximately six blocks north of the business area of North Bend. His injuries were received when he struck a freight train as it was proceeding through the crossing.

The speed limit for motor vehicles on Ballarat Street is 25 miles per hour, and plaintiff testified he was driving his motorcycle 20 to 25 miles per hour as he approached the crossing. The estimates of visibility varied greatly. One witness, who was a passenger in a vehicle headed south on Ballarat Street and waiting as the train passed, estimated visibility at 10 to 15 feet because of the fog. On the other hand, a trainman in the caboose estimated visibility at

three or four car lengths or approximately 150 feet. Plaintiff did not testify to visibility in terms of distance—only that, as he approached the intersection with his motorbike headlight on low beam, "he didn't see or hear anything until all of a sudden he saw the train's wheels", and "because it was too late to do much of anything" he laid the motorbike over on its side and tried to get off to the right. His right leg was crushed and later had to be amputated above the knee.

The train contained 51 freight cars and a caboose. Although subsequent investigation failed to disclose the point of impact on the train, there is evidence from which the jury could conclude that he struck one of the cars near the middle of the train.

Ballarat Street, from the downtown area of North Bend to the railroad crossing, is straight and level except for a slight incline a few feet from the tracks. Plaintiff emphasizes the fact that there is a house located on the southwest corner of the intersection which partially obstructs vision to the west for northbound traffic on Ballarat Street. However, since the train was occupying the crossing at the time, the house obviously did not affect plaintiff's view of the train.

The only warning at the crossing for vehicles traveling north on Ballarat is a standard crossbuck sign with a Scotch-lite facing located approximately 15 feet south of the first rail. The sign warned of the tracks but not of the presence of the train. Plaintiff had lived in the vicinity for years and was well acquainted with the crossing. Ballarat Street is maintained by the City of North Bend and there were lights mounted on poles for the length of the street. Lighting fixtures consisted of an incandescent bulb under a reflector, and the nearest lights to the grade crossing were approximately one-half block on either side. The jury could find that on the night in question the lights offered no illumination to the crossing.

The railroad crossing had been in existence since 1911 but in recent years the railroad moved its trains through

the crossing only once a night in each direction at widely varying times late in the evening. There was evidence of a prior accident which occurred at the same crossing 5 years before plaintiff's accident, and plaintiff introduced evidence of three prior near-accidents and one subsequent accident.

■ Defendant assigns error to the failure of the trial court to grant its motion for judgment notwithstanding the verdict, or in the alternative, for a new trial, contending there was a failure of proof of any cause of action against defendant, and that plaintiff was guilty of contributory negligence as a matter of law. In support of this contention defendant relies primarily upon the well-recognized rule that when a train actually occupies a crossing, that in itself supersedes all other warnings and gives actual notice by its own presence. *Schofield v. Northern Pac. Ry.*, 4 Wn.2d 512, 104 P.2d 324 (1940).

There is an exception to the above rule, however. In *Hewitt v. Spokane P. & S. Ry.*, 66 Wn.2d 285, 402 P.2d 334 (1965), where the factual pattern was similar to the present case, the court stated at page 290:

> But in applying the rule that a train while in the crossing supersedes all other warnings, it being a warning per se as in *Schofield v. Northern Pac. R. Co.*, 4 Wn.2d 512, 104 P.2d 324, we additionally noted a persuasive exception to it. We said, that, where the situation is unusual or extrahazardous, or constitutes a situation in the nature of a trap, the ultimate decision becomes one of fact. *Hendrickson v. Union Pac. R. Co.*, 17 Wn.2d 548, 136 P.2d 438, 161 A.L.R. 96; *Cox v. Polson Logging Co.*, 18 Wn.2d 49, 138 P.2d 169.
>
> All railroad crossings are dangerous—extremely so— but some are far more dangerous than others. Recognition of this truism brought forth the exception that, if unusual or extraordinarily dangerous circumstances prevail, the presence of the train in the crossing is not alone such a warning as to constitute reasonable care and prudence by the railroad under the circumstances. We recognized the exception as equal in status to its parent rule when we said:
>
>> Basically, appellant contends that there is no substantial evidence from which the jury might have con-

cluded that circumstances existed relative to the crossing at the time of the accident which constituted a trap, amounting to an exception to the general rule that the presence of the train was sufficient warning to respondent. If we were members of the jury, we might, by weighing the evidence, reach the conclusion that no trap existed and that respondent was not deceived by the darkness, the black gondola car, the absence of lights or flares, or by the topography of the crossing and the highway approaching it. However, this would be different from saying that there is no substantial evidence in the record from which the jurors could have concluded otherwise. *Wood v. Chicago, Milwaukee, St. Paul & Pac. R. Co.,* 45 Wn.2d 601, 277 P.2d 345.

and at page 291:

Out of the numerous cases arising from accidents at railroad crossings, two rules emerge: All railroad crossings are dangerous, and all travelers upon the highways must so regard them. A railroad train in the crossing constitutes a warning of its presence, superseding all other warnings, and must be heeded.

But where all railroad crossings may be accurately described as dangerous, some are exceptionally so due to unusual circumstances. Each case involving a railroad crossing must, therefore, be considered in light of its own peculiar facts. *Cox v. Polson Logging Co.,* 18 Wn.2d 49, 138 P.2d 169. Where evidence shows the crossing to be exceptionally dangerous, it becomes in law extrahazardous, a term which, through many applications when applied to railroad crossings, has become a term of art, having a special meaning in the law governing railroad crossings.

A crossing is extrahazardous where unusual circumstances or conditions exist which make it so peculiarly dangerous that prudent persons cannot use it with safety unless extraordinary measures are used. *Porter v. Chicago, Milwaukee, St. Paul & Pac. R. Co.,* supra [41 Wn. (2d) 836, 252 P. (2d) 306]. *Bradshaw v. Seattle,* 43 Wn.2d 766, 264 P.2d 265, 42 A.L.R. 800.

■■ As to plaintiff's contributory negligence, it is well established that this is generally a question for the jury, unless the acts of the plaintiff were so palpably negligent as to preclude the possibility of a difference of opinion. *Bur-*

*nett v. Hunt,.* 5 Wn. App. 385, 486 P.2d 1129 (1971). Whether the failure to observe danger that is there to be seen constitutes negligence depends upon the circumstances of the particular occurrence and is a question of fact. *Carrico v. Country Store of Salem, Inc.,* 4 Wn. App. 567, 484 P.2d 412 (1971). The latter rule was applied where the plaintiff approached a crossing at night at an arguably excessive speed. *Wood v. Chicago, M., St. P. & Pac. R.R.,* 45 Wn.2d 601, 277 P.2d 345, 283 P.2d 688 (1954).

■ As stated by the court in *Browning v. Ward,* 70 Wn.2d 45, 48, 422 P.2d 12 (1966):

In evaluating the sufficiency of the evidence the trial court had to keep in mind and apply the rules we have enunciated in a myriad of cases, that the evidence of the non-moving party must be considered in the light most favorable to him, no element of discretion is involved, and that such motions can be granted only when it can be held as a matter of law that there is no evidence or reasonable inference therefrom to sustain a jury verdict for the non-moving party. *Schwab v. Department of Labor & Indus.,* 69 Wn.2d 111, 417 P.2d 613 (1966); *Boley v. Larson,* 62 Wn.2d 959, 385 P.2d 326 (1963); *Helman v. Sacred Heart Hosp.,* 62 Wn.2d 136, 381 P.2d 605 (1963). In addition, the trial court must apply the rule that only in the clearest of cases is the court justified in determining that contributory negligence exists as a matter of law, and that as a condition precedent for such a determination is a conclusion that reasonable minds could not have differed in their interpretation of the factual pattern. *Boley v. Larson, supra.*

Considering the evidence in the light most favorable to plaintiff, the circumstances of this particular occurrence: Wet pavement and dense fog on a dark night, an unlighted freight train moving through an unillumined crossing on an arterial street within an incorporated town, and a complete absence of any signal to warn a motorist that a train occupied the crossing—constitutes evidence from which the trier of the facts could find the crossing to be extrahazardous. The conditions and circumstances were reasonably foreseeable by the railroad, which had been using the

crossing since 1911 and had observed weather conditions in the area. There was evidence from which the jury could find that the crossing was so peculiarly dangerous that prudent drivers, driving along Ballarat Street on wet and foggy nights, could not cross in safety without resorting to extraordinary measures. Under these circumstances we hold it was proper to submit the question of defendant's negligence and plaintiff's contributory negligence to the jury.

■ Defendant's primary contention is that the trial court erred in giving an instruction on wanton and willful misconduct. Willful and wanton misconduct have been defined in the leading case of *Adkisson v. Seattle*, 42 Wn.2d 676, 682, 258 P.2d 461 (1953), as follows:

> Wilful or wanton misconduct is not, properly speaking, within the meaning of the term "negligence." Negligence and wilfulness imply radically different mental states. Negligence conveys the idea of neglect or inadvertence, as distinguished from premeditation or formed intention. An act into which knowledge of danger and wilfulness enter is not negligence of any degree, but is wilful misconduct. As long as the element of inadvertence remains in conduct, it is not properly regarded as wilful. Wanton misconduct is positive in nature, while mere negligence is materially negative. A person properly chargeable with wanton misconduct is not simply one who is more careless than one who is merely negligent. Wanton misconduct is such as puts the actor in the class with the wilful doer of wrong. 38 Am. Jur. 692, Negligence, § 48.

and at page 687:

> Wanton misconduct is not negligence, since it involves intent rather than inadvertence, and is positive rather than negative. It is the intentional doing of an act, or intentional failure to do an act, in reckless disregard of the consequences, and under such surrounding circumstances and conditions that a reasonable man would know, or have reason to know, that such conduct would, in a high degree of probability, result in substantial harm to another.

In the case of *Sorensen v. Estate of McDonald*, 78 Wn.2d

103, 470 P.2d 206 (1970), after referring to the *Adkisson* case, the court said at page 109:

we emphasized that wanton misconduct was not negligence because the behavior embraced within the concept involves intent rather than inadvertence, is positive rather than negative and places the actor in a class with the willful doer of wrong.

Gross negligence or a lack of slight care cannot be equated with willful and wanton misconduct. *See Hansen v. Pauley,* 67 Wn.2d 345, 407 P.2d 811 (1965); *Crowley v. Barto,* 59 Wn.2d 280, 367 P.2d 828 (1962).

Considering the positive aspects of defendant's conduct the evidence is undisputed that the headlight of the locomotive was on high beam, the locomotive whistle and bell were sounding and continued until the locomotive had cleared the crossing, and the train was traveling less than the speed limit of 15 miles per hour because of the foggy condition.

In contending that the issue of willful and wanton misconduct was properly submitted to the jury, plaintiff attacks the general policy of defendant with reference to upgrading warning devices and safeguards at its crossings. Plaintiff points to evidence from which the jury could find: (1) the railroad did not take into consideration increases in the amount of traffic or differences in the mode of transportation; (2) the sole criterion for upgrading warning devices at a crossing is the number of accidents occurring at that crossing; (3) there must be more than one accident in the preceding 5-year period before the railroad will make an independent evaluation of a crossing; (4) the railroad does not employ anyone whose sole responsibility is to check crossings for safety; and (5) while the railroad conforms to safety standards set by state law it does not create any standards of its own.

In support of this attack plaintiff finds comfort in language used by this court in a different context in the case of *Kittitas County v. Chicago, M., St. P. & Pac. R.R.,* 4 Wn. App. 768, 771, 483 P.2d 1279 (1971), where we said:

The world moves on and railroads can neither expect or believe they are the only ones who can remain static. As circumstances and conditions surrounding their crossings change, they must change with them.

However, neither the above observation by the court, nor plaintiff's general attack upon the railroad's safety policy is directed to or applies to the conditions and circumstances of the particular grade crossing in question, which had existed for 54 years. During that time there had been one accident prior to the one under consideration. The prior accident occurred in 1956 when a motorist saw a train approaching, stopped and then started up and tried to beat the train across the tracks. The locomotive hit the rear fender of the motor vehicle. There is nothing in those facts to indicate conditions at the grade crossing were a cause of that accident.

Plaintiff introduced evidence of three prior near-accidents in support of its contention the crossing was unusually dangerous. There is no evidence the railroad had knowledge of these near-accidents.

As stated by the court in *Mendenhall v. Siegel*, 1 Wn. App. 263, 267-68, 462 P.2d 245 (1969):

> Whether the doctrine of wanton misconduct does or does not apply is a question of law for the court. Each case must be viewed upon its own facts. Since the effect of applying the doctrine in this type of case is to defeat the defense of contributory negligence, the factual situation must show on its face conduct or omission so great that the actor must know with a high degree of probability that death or serious bodily injury will result.

While we find sufficient evidence to submit the question of defendant's negligence to the jury, we are unable to conclude there was sufficient evidence from which the jury could find that defendant's failure to provide devices warning of the presence of a train in the crossing was so great that it must know with a high degree of probability that death or serious bodily injury will result.

As stated in *Burge v. Anderson*, 164 Wash. 509, 512, 3 P.2d 131 (1931):

We have frequently and consistently held it to be error to submit to the jury a question where there was no substantial testimony upon which to base the instruction.

We find it was error to submit an instruction on willful and wanton misconduct and a new trial must be granted.

■ Defendant also contends it was error to admit evidence of other occurrences at the crossing. Proof of other accidents at the same crossing at other times, under the same or similar circumstances, may be received for the purpose of showing the existence of a dangerous condition. As stated by the court in *Blood v. Allied Stores Corp.,* 62 Wn.2d 187, 189, 381 P.2d 742 (1963):

> Evidence of other accidents is often admissible to establish a dangerous or defective condition and notice of a defect. *Porter v. Chicago, M., St. P. & P. R. Co.,* 41 Wn. (2d) 836, 252 P. (2d) 306. Because collateral issues are thereby interjected into a case, as a predicate for admission, there must be a substantial similarity shown between the proffer and the case at bar. Each case presents a question *ad hoc* and leaves all collateral requirements as to similarity to the trial court's informed discretion. See annotation, 70 A.L.R. (2d) 170.

In the case at bar plaintiff offered evidence of three prior near-accidents at the same crossing. Evidence concerning those near-accidents was admitted by the trial court after first determining that they were substantially similar. A review of the testimony reveals no abuse of discretion in this determination. While such evidence was not admissible to show notice to the railroad of a defect, it was admissible for the limited purpose of attempting to show a dangerous condition.

The same cannot be said, however, for the admission of testimony concerning a subsequent accident which occurred at the same crossing.

On the morning of the third day of trial, Mr. Jorgensen, assistant general adjuster for defendant railroad, resumed his testimony under direct examination. Before doing so, counsel for defendant called to the court's attention that there had been an accident at the crossing in question 2

days before. This was the evening of the first day of trial. He made a motion in limine to prohibit plaintiff's counsel from mentioning that fact on cross-examination unless plaintiff first made an offer of proof showing substantial similarity between the proffer and the case at bar. The court ruled, in effect, that the proper time to object was after the witness had been asked if an accident had occurred.

Thereafter, during the cross-examination of Mr. Jorgensen, plaintiff's counsel asked, "Isn't it a fact that on the evening of March 18 you had an accident in 1970 at this crossing?" Objection was made, the jury was excused and a discussion was had between counsel and the court. Plaintiff made no formal offer of proof as to similarity of conditions, it being plaintiff's contention that it was sufficient that the accident happened at the same crossing, at night, and the motor vehicle was traveling in the same direction. The court overruled defendant's objection, the jury was recalled and the witness Jorgensen was questioned with reference to his knowledge of the accident of the night before, as follows:

MR. HODGE: Will you please read the question? (Last question was read by the reporter.) A I have received a notice that there was an accident about 8:35 p.m., Wednesday night, the 18th. There was a man and woman in a pickup truck struck on the crossing. I am not positive, but I believe they were traveling north. Q (By Mr. Hodge) Which would be the same way Bill O'Dell took? A The same as O'Dell. I believe, although I am not positive that the train was going east, the same as — Q The same as Bill's? A As in this one, yes. There are many things, of course, that I do not know about it. That is about all I know. I don't know anything about the weather, the condition of the driver. Q It was dark at 8:30. I mean, we can assume that? A Yes, it was undoubtedly dark. Q They were in a motor vehicle, a pickup, is that correct? It is a Chevrolet pickup? A I don't know, all I know is that it was a pickup, as I recall. Q And this sign was there, is that correct? A Well, it was there the last time I was there. Now, I haven't been there since that picture was taken. Q You haven't had a report that

it is down? A No. Q The Scotch-lite was there, that you have testified could be seen from 300 feet? A I really can't say because I wasn't there the other night. I don't know. Q No report that it's down? A No. No, I would imagine that it was up, otherwise, well, I wouldn't say for sure. Q The train hit the pickup truck, isn't that correct, the engine? A I believe it did. Now my information is, I just don't have much beyond that. Q Do you have an accident report with you on this? A No. Q Have you seen one? A Not the regular form. That hasn't come in yet. We call them on the railroad a wire, a telegram, in other words, came from Tacoma from the superintendent telling me that there had been an accident and, well, I just don't have it in front of me and I think I have told you just about everything that this report says. Q Actually the weather was clear that evening, wasn't it? A I do not know. Q That was Wednesday night, the day we started this trial? A Of course, I wasn't at North Bend. I couldn't say. Q Well, was it on the report? A I think it was. I believe it was. Q It was clear? A Yes, I believe it was. Q You didn't go out there during this trial to investigate that accident? A No, we have not as yet made any investigation. Q People are still in the hospital. You haven't talked to them? A I know nothing about it. Q Do you know they are in the hospital? A I understood they were taken to the hospital, but whether it was just for an examination or whether they were injured, I don't know.

Aside from the agreement of counsel that when the subsequent accident occurred the crossing was illuminated by floodlights recently installed by the City of North Bend, the above was the only evidence presented with reference to that accident. We find it insufficient to establish a similarity of conditions. Upon retrial the plaintiff should make an offer of proof and the court should rule on the question of similarity of conditions before evidence is presented to the jury concerning the subsequent accident.

Finally, defendant assigns error to the refusal of the trial court to give its proposed instruction No. 16, which reads as follows:

The violation, if you find any, of a statute is negligence as a matter of law. Such negligence has the same effect

as any other act of negligence. Therefore, it will not render a defendant liable for damages or bar recovery on the part of a plaintiff claiming injury and/or damage unless you further find that it was a proximate cause of the claimed injury and/or damage.

The court gave an instruction on the statute which provides that no person shall drive at a speed greater than is reasonable and prudent under the conditions.[1] The instruction, however, does not provide that violation of a statute is negligence as a matter of law.

■ There was evidence from which the jury could find that plaintiff approached a grade crossing which was familiar to him, at a speed greater than was reasonable and prudent under the conditions and having regard to the actual and potential hazards then existing. Under these circumstances defendant's proposed instruction was proper and should have been given.

Judgment reversed and remanded for a new trial in accordance herewith.

MUNSON, C.J., and GREEN, J., concur.

---

[1]"INSTRUCTION No. 13

"A statute provides that no person shall drive an automobile or other motor vehicle at a speed greater than is reasonable and prudent under the conditions and having regard to the actual and potential hazards than existing and he shall so control his speed as may be necessary to avoid colliding with others who are complying with the law and using reasonable care.

"The statute provides that a driver shall drive at an appropriate reduced speed when approaching and crossing a railroad grade crossing, and when any special hazard exists by reason of weather or highway conditions.

"The maximum statutory speed limit at the place here involved was 25 miles per hour."